22-1641 Alifax Holding v. Alcor Scientific Mr. Tucker, please proceed. Thank you. May it please the Court, I'm Todd Tucker from Calfee Halter Griswold in Cleveland and I represent appellant Alifax. Alifax asked this Court to reinstate the jury verdict finding trade secret misappropriation in a rather classic fact pattern, a situation where a competitor recruits a knowledgeable employee from the market leader, has that employee take confidential information from the market leader, join the new company, and develop a competing product in only a few months. What's unusual about this case is that the trial court overturned the jury finding that Alcor unjustly enriched itself to the tune of $6.5 million, even though the employee at issue, Francesco Frappa, admitted taking Alifax's software, and programming that software and part of it, the conversion algorithm, into Alcor's source code that was used in its prototype models. Also, Alcor agreed to pay for that conversion algorithm, pay Frappa for the conversion algorithm. And then finally, the court described the damage award as a rational appraisal. Well, let's stop for a sec, because I think your first argument is about liability. And if I'm understanding it right, it's about whether or not it was appropriate for the district court to order a new trial on liability. Is that right? Am I following you? The district court ordered a new trial on liability, yes. And also, initially, a new trial on damages, and then made a series of orders that removed the damages theory from the case. I'm trying to keep you focused on the first argument, because I think if I understand it right, your first argument is that it was erroneous to order a new trial on liability with regard to the conversion algorithm trade secret. Is that right? That's correct, Your Honor. Under U.S. v. Rivera-Rangel, when a new trial is being granted on or predicated on the weighing of evidence, which is what the... Let me try to help you streamline this, because there's so many issues in this case, so I want to keep you focused on what I care about at the moment. It seems to me that I see a district court that erred in failing to understand the statute and the legal definition of misappropriation, which includes acquisition. It seems that it's undeniable the evidence of record showed acquisition. Mr. Frappa took it over to Alcor. They used it. But what the district court judge seems to have gotten waylaid on is concerns about, well, they didn't use it in a commercially profitable way at the end of the day. But that's irrelevant to the question of liability, because liability includes, on its base, acquisition, not just use or commercially viable use. And so that's where I perceive there to be an error in the district court's initial decision to grant a new trial on liability, is a failure to appreciate that. Can you address that issue? Is that one of your arguments? Do you agree with what I've said? Do you think I should go further than that? That seems to get you back to a liability judgment. I absolutely agree with that, Your Honor. The Rhode Island Uniform Trade Secret Act says that misappropriation of a trade secret is acquisition or use. There's admitted acquisition. The judge got into the whole use rabbit hole, if you will, and did, I respectfully submit, miss the boat on the Rhode Island Uniform Trade Secret Act that says mere acquisition is misappropriation. So just by the acquisition, there's liability. And so is it your view, then, if I agree with you on that interpretation of the Rhode Island law, which, by the way, I do, that the solution is to reinstate the first finding of liability? I would agree that, yes, reinstate the first finding of liability. We also submit that because of the compensatory damages being intertwined with the same facts, the same issues, that that should be reinstated as well, the $6.5 million of unjust enrichment. The problem you have there, from my perspective, is that the judge concluded that there were some significant difficulties with your expert's testimony, and he ended up sort of after the fact excluding that, and that $6.5 million judgment was a judgment that was rendered by a jury that heard all that testimony. Isn't that correct? The jury heard that testimony, but the series of orders that end with the September 2021 order, where compensatory damages as a theory is removed, it's not showing any prejudice to Alcor that would be required to remove it. The underlying evidence of unjust enrichment under the restatement, the burden shifting for proving this, is Alifax has to show the revenues that the Head Start generated. Yes, but apart from your expert, what other testimony did you actually present in that first trial that resulted in the $6.5 million damage verdict? We had Mr. Frappa's employment agreement that showed the convoy's sales. There was the testimony about the trade shows that give the Head Start, and then that's where in the conferences for the presentation to the jury, when Mr. Bocart's opinion was excluded, the suggestion was, and this would be proper, that the CEO of Alcor, who was in the room, could be put on the stand, and all Alifax has to do is show what the revenues were for the Head Start, and that was in an Alcor document. I agree with everything you're saying right now, and you've got me on this notion that this needs to get sent back, and there needs to be a new trial on damages, because you had other witnesses that could supplant and therefore justify a damage award, but the problem is Mr. Bocart can't be one of them. He has to get thrown out according to the district court judge, and I don't see how we can just reinstate the $6.5 million verdict, because the jury heard his testimony, and we can't know, since it's a black box, to what extent his testimony formed the bases for that number. So I don't know how we could possibly reinstate that number, as opposed to simply sending it back and asking for a new damages trial, allowing Mr. Bocart's testimony to be excluded, but allowing you to present all of this other evidence. That certainly is an option, Your Honor. The issue with the new trial order on damages is the court never discusses what's the actual prejudice. When you look at the interplay, and as the case law says, I don't know how to pronounce the case, but U.S. Let me ask you a couple questions along those lines. One, did you actually present, and I understand based on the record, maybe Trial Exhibit 198? Was that a portion of what Mr. Bocart's testimony was based on, the Summary Trial Exhibit 198? So his testimony was based on putting up Exhibit 173, which is in the record at the specific pages in the Appendix 15960, putting that up. And then after introducing that evidence under 1006, his testimony and 198 were summary testimony. Is that exhibit in the Joint Appendix? If so, where? Exhibit 198. I know where Exhibit 173 is. We will get that for you. Are you intending to pit Mr. Bocart on any new trial? Like let's say we remand for a new trial on damages. Are you trying to present this person again, or would you present some other witnesses, such as the witnesses that Judge Moore was talking to you about? Well, there's two options. We could first off present the other fact witnesses, the CEO and the VP of International Sales for Alifax, who would explain the market. The second option is we also have appealed the court removing the signal acquisition trade secret from the case at the jury instruction phase. That was improperly removed. If we have a new trial where we're going to do damages, we also have argued that we should be given a new trial on signal acquisition. That leads to a snowball or a cascade. If we have liability of signal acquisition, then Mr. Bocart's opinion is admissible. Just to stop you there, hold on, just so I can make sure I get this exactly on the record. You're saying that if you were to put Mr. Bocart on, you would only put him on for damages testimony related to signal acquisition if the signal acquisition trade secret were to get into any sort of new trial. That's correct, Your Honor. Okay. Let me also get from you exactly where you contend in the record. We can find your statement regarding the signal acquisition trade secret and also where exactly in the record you have stated the conversion algorithm trade secret. I want to make sure that I have those statements precise. Okay. The conversion algorithm is, give me one second, it's complicated. The conversion algorithm, the test results of the conversion algorithm, I believe, is 7.759.7761. I believe it's on 7.761. Testing results showing use of that algorithm, I believe, are 15.742 to 15.710. So that's the conversion algorithm. Okay, hold on. Yeah, we need to pull these pages. And also, can I ask you about JA15193, which is the jury verdict form, which mentions conversion algorithm. Is that sufficient statement regarding the conversion algorithm trade secret, JA15193? The entire trade secret in the jury instruction that included signal acquisition is, I know it's very complicated. The full instruction is at our opening brief on page 20. The full instruction should have read, the manner in which software used in plaintiff's ESR analyzers initiates an ESR measurement from a blood sample loaded in the analyzer, handles a blood sample to introduce it into the capillary container, and instructs the ESR analyzer to obtain photometric data, handles and converts the photometric data to calculate the ESR of the blood sample. That instruction was edited. And then, so the jury verdict form for conversion algorithm is correct, but there's nothing on the verdict form about signal acquisition. Okay. Just to make sure I have it, which page were you reading from just now? I want to make sure the record's clear. Page 20 of appellant's opening brief. And does it cite to a specific page in the joint appendix? It does. This is a tough outline because there's so many issues here. We also recognize there are a lot of issues here. Did you present any LFX documents to the district court as evidence of your signal acquisition trade secret? Yes. So that is, let me get back. What documents? Yes, there is a document. It's called the ISED software procedures description. And what that. What page? I'm getting there, Your Honor. That is, I believe, 15716 to 15719. If we look at this document, what this is, this is the confidential information on how you start, stop the blood flow, how you, for instance, turn off the heater to eliminate noise so that you can get a proper photometric reading. So this is the confidential information. You have to know this information in order to then turn that into software code. Wait, let me clarify. Is this an Alcor document? It has an Alcor Bates number on it. This is an Alcor document. Oh, I'm sorry. So, but my question is where are the LFX documents that have the signal acquisition trade secret as opposed to the Alcor documents? I didn't know where your LFX documents are with that. Yes, I'm going to need to get that, and I'll tell you on rebuttal. But this is a document that FRAPA admitted to drafting when he got to Alcor based on LFX information. And it even uses LFX as the identifiers. What I'm struggling with, even on this document, is what exactly is the signal acquisition trade secret? What is it? I don't understand. I understand your definition of conversion algorithm trade secret, but what is exactly? Tell me. What words? What is the trade secret for the signal acquisition? So, as you're moving the blood through the machine, there's several techniques that you could not reverse engineer. For instance, knowing when to start, when to stop, when to turn off the heater, when to turn the heater back on. That information is in this document. That's confidential information of Alifax that FRAPA only knew, that you would not reverse engineer from getting one of the Alifax machines, that they only knew from being at Alifax and then knew how to solve that problem. I have used my whole time. We're going to give you some more time. So, along with Judge Cunningham, my question is, so where did you describe that for the district court judge so he would understand? I read all your stuff, and I walked away not understanding what your claim was, like what the signal acquisition trade secret even was. So, I kind of have a little sympathy for this district court judge who may likewise not have known it, because here I am on appeal where you should be really able to streamline all this for me, and I didn't understand, and I still don't, as I sit here, understand what your arguments are precisely about what your signal acquisition trade secret is. So, Your Honor, if you look at the Astromed case, that talks about where you hire an employee specifically to bring confidential information. You want to create a presumption. But the problem is you want to create a presumption that he gave something, but you haven't told me what that something is. That's where I'm struggling. I don't understand what your trade secret is. It's like the formula for color. Yep, I got it. That's a trade secret, right? Your conversion algorithm trade secret, I actually agree. It's on like 7761. It's kind of defined, and it's understood, and you made assertions along the way about exactly what it was. But you really left a record in which I can't figure out what your alleged trade secret is for the signal acquisition trade secret, and that's why I'm struggling. I don't know. Look, I think all kinds of bad things happened here, and you got my sympathy. I think the guy stole stuff. I mean, my favorite part is when he told you all that he needed your recommendation letter for his new job in Italy when, in fact, it was for his visa for, yeah. I mean, there's all kinds of bad stuff here. There's bad actors. But you have an obligation to clearly define what the nature of your trade secret was, and I'm struggling to see that you met that obligation for this district court judge, because I sit here and don't know what it is. So first off, if I could address one thing on AstroMed, we're not arguing that it's a presumption. We're saying it was an inference that the jury was allowed to accept. So I don't want to be accused later saying that AstroMed creates a presumption. It creates an inference. But even in this inference concept, I mean, if I can't, if I have no, jury's inferences can only be based on things that are reasonable to infer, and I can't figure out what your trade secret is. And you haven't still articulated it for me, and maybe you're going to do it on reply, but that seems a little late for him. I'm going to try to do it right now if I have 30 seconds. On Appendix 2000, I believe it's Paragraph 5. This is an interrogatory answer that then the jury instructions were built off of, and that is describing what the signal acquisition trade secret is. Did this end up in the proposed jury instructions, this Paragraph 5? So 5 is going to track into the jury instruction that I mentioned from page 20 of our opening brief here. I believe 5. I need to see what it is, but from memory, it's got both conversion algorithm and signal acquisition in it, and there were two instructions. Thank you. The other thing that I want to make sure you give us on the record were a couple things. One, you mentioned that there was, and I asked you about it, Trial Exhibit 198. I don't think that's in the Joint Appendix. If it's not in the Joint Appendix, please give that to us. Okay. Number two. That is 15979. What is 15979? Exhibit 198. Okay. And then also you mentioned that there was testimony admitting that that Alcor exhibit we were talking about that you contend is related to the signal acquisition trade secret comes from Alifax's knowledge. What page of the record can you point us to where you're saying there's testimony admitting that? I will have to get that for you, Your Honor. I don't. I'm just. So jury instruction for what your trade secret is and how it's defined is at 10534. Will you look at it with me? Because I see how you've clearly defined your conversion algorithm trade secret in this jury instruction, but I don't see and it's hard for me to understand what it is you're saying corresponds to a separate trade secret in the form of the signal acquisition trade secret. Let me get it. 10534. Take a minute. Certain. So I'm looking at number two on that page. Yep. Certain software and firmware elements of the ESR analyzer that cannot be reverse engineered. So that's talking about both the conversion algorithm and all these techniques for getting the blood in a place to where you can acquire the photometric measurement. No, it's talking about software and firmware elements. That's not talking about how to do anything with blood. Software and firmware elements aren't blood. That's actually software. Right, but if you continue on, Your Honor, including how to acquire photometric signals from a blood sample. Photometric signals from a blood sample are the information, for instance, the certain variables. So wait. Stop for a second. So then are you saying the signal acquisition trade secret is how to acquire photometric signals from a blood sample? Because the next part, how to convert those signals into an ESR, that's the conversion algorithm. So it's definitely not the next part. The second half from the word and to one. Everything after that. And in fact, your last sentence says that's the conversion algorithm. So the only thing that isn't clearly and unequivocally the conversion algorithm, and I think it might be the conversion algorithm, but is that part that says how to acquire photometric signals from a blood sample. So are you saying that's the signal acquisition, the definition of your signal acquisition trademark? That is a describer of the signal acquisition trade secret. And then when we go back and look at the document DRAPA drafted, the ICED software procedures description, that then gives the details for the signal acquisition, the obtaining the photometric. And that is, again, 15716, 15719. These are not hostile questions. Just listen and hear me out and try to focus. So 10534, you say you define trade secret for the jury instruction is how to acquire photometric signals from a blood sample. That's the only portion of anything on this page that could arguably be relevant to the signal acquisition trade secret. Now let's go back to your complaint at appendix page 2000, okay? And I think this is a complaint, or maybe it's not a complaint. I don't remember what document page 2000 is, but you pointed it to us. And let's look at number five on page 2000, because I think that further describes, you know, because you've just got a tiny little fragment of a sentence here, right, to acquire photometric signals from a blood sample. That's, you know, that's going to have to carry a lot of water. But are you going to tell me that what's in paragraph five is, for the most part, a more detailed description of what that trade secret is in terms of the signal acquisition? Yes, so paragraph five then ties to appendix 15716, 15719. That appendix exhibit, that then gives the specific confidential information that you need to do on the signal acquisition to meet what's in number five of this interrogatory answer. But the part that I'm still struggling with is that's an Alcor document, right? Those pages you were describing to us. And what I want is at least at a minimum where you said there was testimony where Frappa admitted that he created some portion of that document based off of stuff he learned at Alifax. Or if you can give me an Alifax document that shows the signal acquisition trade secret, that would help too. At trial, Mr. Deutch, D-U-I-C, who was a director of R&D for Alifax, he testified that the ISED device was operating in the same manner for signal acquisition as what Alifax did. And he said that that could not be reverse engineered, I believe, and that the only way that that got to Alcor was through Frappa. And that's why the inference of AstroMed comes into play. Can you point us to the citation so we can look at that testimony ourselves as well? So with that, I know I've gone very long. I appreciate it. All right. Just do a rebuttal. Sit down. Sounds good. Mr. Scott. Mr. Scott, you can have all day if you wish. I won't burn you with that, Your Honor. May it please the Court. Let's start with signal acquisition in your question, Justice Cunningham, because you're not going to find that in the record because Mr. Deutch testified on cross-examination that signal acquisition is not a trade secret. And in fact, their expert witness testified that signal acquisition is not a trade secret, and that's Dr. Bergeron. Well, when you say signal acquisition is not a trade secret, did they have, I mean, are they alleging that there was some trade secreted way in which they were acquiring photometric signals from a blood sample, some method of doing that that was secret? Not at the time of trial in this regard. The signal acquisition trade secret that counsel read to you, that long measurement that's in their blue brief at 19 to 20, that was narrowed, modified, curated before trial. And we went through in our brief showing the dozen or so trade secrets. What do you contend the signal acquisition trade secret is? Do you agree with these citations that he gave us? Pages 2,000, and then we also looked at a proposed jury instruction. No, because the signal acquisition trade secret at the time of trial, that's why I was going through the arc of the modified and revised trade secrets. At the time of trial, it was limited to this, the means of optical signal acquisition. Where are you looking to say that's what it was limited to? I'm looking at the District Court at Appendix 11-727, which is the decision on the cross motions for summary judgment. And then I should also add that at the time of trial, there was a preliminary jury instruction at Appendix 13-829. So what is 11-727 again? Those are the two theories that remain for trial. The means of optical signal acquisition, and two, the means of converting photometric measurements to an ESR value. That was a result of the cross motions for summary judgment. But this doesn't say anything that narrows or defines what the means of optical signal acquisition is, and whether or not there are allegations that we should look to page 10534 and page 2000 to fill in that gap. So the fundamental flaw in this whole signal acquisition theory of Halifax is that it's not a trade secret. That it's selectometry. It's the process of making optical measurements. That's not protectable. That's the 557 patent to Schmidt-Schonbein. That was the subject of the concessions at trial, that signal acquisition. Not only was there an absence of evidence for it to go to the jury, but there were concessions by their principal witness, Mr. Deutch, and their expert technical witness. I'm going to be interested in those citations for those concessions as well, just to warn you. But what I also want to know is do you still agree or not agree with their statements about what the actual signal acquisition trade secret is, pointing to the pages that Chief Judge Moore just reiterated? Yes. I disagree with their statement. They're going back to what they lost at summary judgment with this kind of very technical, detailed description of trade secret that was modified by them. And then as a result of the summary judgment proceedings, the preliminary juror instructions was as I read earlier. It was just a means of optical detecting of a signal. The reason why they're focusing on that, but they don't have proof or even evidence that it's a trade secret to the contrary, is that their technical expert witness only testifies as to a one month to acquire a signal. And that's where their damages expert connects to it. So if you don't have signal acquisition in the case, which is out of this case, then you don't have any damages. And that leads into the damages discussion of earlier. So there is no signal acquisition trade secret. It wasn't enough to get to the jury. You said no damages. Now I remember there was a $6.5 million figure for the conversion algorithm trade secret. Are you saying that you mean no damages related to the signal acquisition trade secret? I just want to be precise regarding what your statements are. Signal acquisition never went to the jury for a failure of proof. Understood. And the jury verdict of $6.5 million resulted from an error under Rule 1006 of their expert after being excluded being able to testify essentially as to his expertise. Do you agree that $6.5 million is related to the conversion algorithm trade secret? I disagree with that because the $6.5 million trade secret, and this is the subject of the Rule 59 order, was connected to Dr. Bergeron's opinion as to a one-month head start as to signal acquisition. So there wasn't any evidence to support any number for the conversion algorithm relative to a head start. But there was misappropriation of the conversion algorithm. No, there was not, and I disagree. The district court made that finding in the context of a Rule 50 determination where he has to look at the evidence in a way that's favorable to the jury verdict. But through the lens of Rule 59, he found that there was, to quote the district court, a mother load of contrary evidence that does not support that jury verdict. He uses phrases like a wafer-thin factual record that in super bowl. Yes, but in the first decision he made where he overturned the original liability verdict on the conversion algorithm, he seems to have misapprehended the legal standard for misappropriation under Rhode Island law, which includes acquisition and not just commercially viable use. I disagree. Well, I'm sure you do, but I'd love to hear why. Yeah, of course, Your Honor. So this court just six weeks ago in the synopsis case said that if there's not a trade secret definition that's been met, that dooms a misappropriation claim. And the way Alifax briefed this appeal is they go right to misappropriation. And we can go through those issues separately. But it doesn't meet the definition of a trade secret. And that's what the district court exhaustively, to use his words again, unpacked. The detailed unpacking to show that there was no economic value. So the definition of trade secret requires under Rhode Island and the Uniform Trade Secret Act... I don't understand him when he overturned the liability decision to be doing it on the basis of a failure to establish a trade secret. I understood him to be doing it on the basis of failure to show use of a trade secret. Am I missing something in that original opinion? You're not missing something, Your Honor, but the word use in the 59 section of that brief goes to economic value. That Alcor got no use out of the Yes, but that could simply be, look, you could steal a trade secret for coke, but not have a manufacturing facility capable of producing it. So you stole it, you acquired it, but you weren't able to make it a commercially viable venture for you because you don't have the manufacturing facility with all the parts that you need to be able to make it. That's still misappropriation because you acquired through illicit means someone else's trade secret. No, it's not, Your Honor, respectfully. You have to... Your Honor, you're going to step number two before addressing step number one. And step number one under the 641-1 of the Rhode Island Trade Secret Act at subsection four defines trade secret as meaning that derives independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from such disclosure or use. I'm sorry, but just because your company couldn't figure out how to use it in a manner that could give you economic value, it doesn't mean everyone else couldn't. In fact, Alifax did. No, that's because that technical expert Dan Smith, and that is that there is no economic value of Alifax's putative conversion algorithm trade secret because it would not work in a ICED machine, Alcor's agrogometer, because it's device specific. And he did an empirical test showing that. But the most fundamental thing here is that... The district court concluded... Repeatedly. Your Honor, the district court concluded... Yes or no. I'm sorry? Yes or no. Did the district court make repeated holdings in this case that the conversion algorithm trade secret is a trade secret? The answer is... Under Rhode Island law. He said that there was sufficient evidence applying the Rule 59 standard, he said that there was insufficient evidence for a reasonable jury to reject undisputed technical expert testimony and the other facts that we laid out, that the conversion algorithm had any economic value use to Alcor. But if that were true, if that were true, if there was no reasonable person who concluded it had any economic value, then how come he left the liability decision the second time around? Because at the 59 stage... What is this different standard that you're talking about? There's no difference. Let me back up. At a retrial, he could have granted a Rule 50 in our favor on the trade secret issue on the conversion algorithm. And he said it barely crossed that threshold. Those were his words. It barely crossed the threshold of 59. But viewed through the prism of Rule 59, the conversion algorithm doesn't have any economic value. He never said that. He did not say that. He would like to stick back findings into the decision that simply weren't there. And your entire argument is because it didn't have value to Alcor, therefore it has no economic value to anyone. And that seems to be proven completely false by Olifax's own success with it. No, that's not my argument, Your Honor. My argument is that it doesn't meet the definition of trade secret under a rule of law because it doesn't have any economic value to Alcor. And yet the judge concluded to the contrary twice. In the context of Rule 50, that there was sufficient evidence for the jury. And if I may, can I just explain what the factual gap is here? Is that that correlation algorithm is not generated by source code. It's generated by Excel. And the aggregation index through the Alcor device, which is unique to any other device, is one data set. The second data set is the Westergren values. That information outside of the source code environment is plugged into Excel and using its regression analysis function generates that correlation or conversion algorithm. It's not the source code. And their conversion algorithm wouldn't work in the Alcor device, which is something that was proven at trial. Counsel, show me anywhere in his new trial decision on liability where he talked about independent economic value. Anything along those lines. Anything you can point to that suggests that this is what he was thinking. I can, Your Honor. Because it's all about use. I can, Your Honor. We'd love to see it. Appendix 55. The jury's apparent decision to reject the technical expert's decision. Let me get to wherever you are. And what document is Appendix 55, just so we're all on the same page. That's the post-trial decision on 50 and 59. The post-trial decision in which he first rejects liability. This one? Yes, Your Honor. This is the one where he rejects liability for the CA algorithm. This is where he grants the Rule 59, Your Honor. I'm with you now. Where are we on page 55? What do you want us to look at on page 55? Yes, on 59 where he says the jury's apparent decision. 59, not 55? 55 is one. The jury's apparent decision to reject Judge Dan Smith's opinion, absent any reasonable challenge by Alifax to the basis for his opinions or an alternative explanation for his findings, raises insuperable doubts about the verdict's soundness. I'm really sorry, but I'm just having trouble finding where you're reading from on page 55. Oh, okay. I think I'm there now. Alifax argues correctly that the jury was free to reject Smith's testimony. Is that where you're reading from? No, Your Honor. I'm reading from the sentence that begins with, however. Okay. Got it. But this is all about Mr. Smith's testimony. What did Mr. Smith's testimony go to? Mr. Smith's testimony went exactly to that. There's no economic value to Alcor. It never said to anyone. It said to Alcor. Go back and look at Smith's testimony. Right, to Alcor. Yes. It's not a trade secret only if it's valuable to you. It's a trade secret if it's valuable to anyone. That's not their proof, Your Honor. They don't have evidence to support that. They were arguing that it was valuable to them. There's evidence to support it was valuable to them. But they have to show it's true. As to the conversion algorithm verdict, quote, Okay, listen. I don't think you and I are going to agree and it doesn't seem like you're going to be able to convince me. So let's move on to the other issues because I think they're important. Suppose I think it was a mistake for him to have ordered a neutron liability in the first instance because I think that he failed to appreciate the Rhode Island law included acquisition, not just use, and that he definitely didn't make any of these findings about the trade secret that you're talking about. What happens then? Do I reinstate the $6.5 million jury verdict? I'm assuming you're going to say no, and so I'd love to hear that. Bergeron testified that there was a one-month advantage on signal acquisition, which is the same trade secret that didn't even make it to the jury, and which, as I indicated earlier, was not even a trade secret as they conceded. It's not required to support generally, but here, that's their only disclosed damages expert. In their interrogatory responses, it's only Dr. Bockhardt who disclosed and identified damages versus liability witnesses, or could you just identify all the possible witnesses? Well, we gave... They didn't disclose it in their initial disclosures. They didn't disclose it in response to a damages interrogatory. They didn't supplement the damages interrogatory, and when Mr. Bockhardt was excluded from testimony for trial, the president of Alcor, Ms. Ruggieri, and they declined to do it. That's actually my specific question, though. When you prepare and identify and give witness lists to the court, oftentimes you can just identify all your possible witnesses. Was the requirement for this court that you had to identify these are the possible damages witnesses, these are the possible liability witnesses? No, that wasn't part of the pretrial order, but the disclosure is the disclosure, and that's the 403 analysis that the district court entertained, because without an adequate disclosure, that unfairly prejudiced Alcor, because the only disclosure was Bockhardt, and Bockhardt's testimony did not align with the evidence in the case or the opinions disclosed by Dr. Bergeron, and under First Circuit law, the appellate court's role is not to conduct afresh a Rule 403 balancing. Do you agree that there were other witnesses, other fat witnesses, separate and apart from Mr. Bockhardt, who could put on some of the damages testimony? No. Why? Because they haven't identified anyone. There's no one that they've identified. I thought when I was listening to your opposing counsel, I thought he identified a couple of fat witnesses that he thought would be useful, and maybe I need to be more precise. He identified potential fat witnesses that could help on damages on the conversion algorithm trade secret. He had separately said that for purposes of the signal acquisition trade secret, if we thought that was in the case, he would need Mr. Bockhardt. The signal acquisition trade secret is not part of the damages analysis. Agreed. And so your question, Your Honor? Okay. Let me restate. Do you agree with my statement that your opposing counsel identified some witnesses who could assist with damages with respect to the conversion algorithm trade secret who are not Mr. Bockhardt? No. I do not agree. That's not in the record. They won't. In their brief, they talk about Ms. Rizzotto, who's one of their witnesses for marketing. Carla Ruggieri, who is the individual I referenced earlier, is the president of Alcor. She was the only one who can get Alcor CEO, AEO information. The district judge availed them to, with Bockhardt being excluded from opining on damages, to call Ms. Ruggieri to the stand. And they declined to do it. So are you contending that they would somehow be precluded from utilizing those individuals in a second trial? Yes, that's right. Because the district judge in weighing the evidence and made a determination that the scope of the retrial, and that limitation is afforded a very great deference on appeal, the scope of the retrial. And that's the Fusco case in the First Circuit. So no, they don't have any other witnesses. And that's why it's limited to $1. Here's the problem. They didn't call Ruggieri in the first trial because the district court had already agreed to let Bockhardt testify. So now in hindsight, if Bockhardt can't testify, why can't they call Ruggieri? Because Ruggieri can't testify as to a head start. There's no one there to testify to a head start. Because that testimony is out on retrial. And there's no one to connect that to an alleged unjust enrichment. Alcor's CEO could get the spreadsheet of Alcor's sales into evidence, which was part of the record. I don't see what prejudice Alcor could suffer from its CEO discussing a document Alcor itself prepared. But there's no evidence on retrial, Your Honor, relative to the head start. And the district court expressly said at pages 85 and 86 they could prove a head start. Well, I don't know what... Do you have further questions? I guess you're okay. I think I'll leave it there for the time being. Any further questions? Okay. Thank you, Mr. Scott. Mr. Tucker, we're going to restore two minutes of rebuttal. Okay. Thank you. Oh, and we didn't address the cross-appeal. So you're not going to get any rebuttal time on your cross-appeal because that didn't get addressed. Well, may I have a few minutes to address it, Your Honor? Okay. Go ahead. I'll make it very brief. Thank you for the accommodation. On the copyright cause of action, there was an abject failure of proof on that. So there was three copyright registrations that were filed by a plaintiff's counsel in the middle of trial after reviewing Alcor's source code. And as a result of that, they amended their complaint over our objection to assert a copyright claim. But they never put forward the basis for that copyright claim. Going into trial, they survived summary judgment on it by saying that they will put on evidence, but they never put it on the basis for the copyright cause of action. Well, a failure of proof doesn't justify fees. A failure of proof doesn't justify fees per se, but if the cases like Mag Jewelry and the other cases that have been cited by the parties, they all involve a situation where the copyright holder presented the actual deposit copy or the basis for the copyright registration, what's behind it. Here they never presented that. That's what makes it objectively weak in the First Circuit. And then on the patent side, I won't spend too much time on that, but they were never able to prove that patent case. As you read in the post-trial decisions and kind of the arc of the judge's commentary about plaintiff's proof, part of that is that a third of this trial was spent on patents that they can never prove because following pre-suit, the ICED didn't meet the limitations of the asserted claims. Markman, post-Markman, it didn't. And going into trial, their expert conceded that the ICED does not register a value for viscosity, elasticity, or density. So they were never able to prove their patent case either, and that was a third of the case. You're representing a side where there certainly appeared to be a misappropriation, but holes in the case, and you're asking for fees. The patent case is distinct. It's compartmentalized. The copyright case is distinct. And when you look at the hole, they had 12 or more trade secrets that muted, were modified, changed. Even here on appeal, they're reverting back to an alleged signal acquisition trade secret that was narrowed before trial. So on everything, except for that one conversion algorithm, the defendants prevailed on, but clear prevailing party on copyright and clear prevailing party on patents. Yeah, but we review it for an abuse of discretion, and the district court said it was not objectively weak. We don't really go behind that. I mean, we said it was not objectively weak. So I don't know what you want, and Judge Lurie's position is really well taken. I mean, when you have a client that lied and stole and snuck around, it's kind of hard to come in and say, oh, we're the ones with the white hat on, and we should get attorney's fees. That's a tough road to hoe, and this district court judge, we review them for abuse of discretion. Well, I just, thank you for your time. I just disagree with the lie and the stole, because the district court found that it had no value to Alcor, and source code per se is not, taking source code is not per se a theft, and it's not stealing. Thank you. I'm going to give you four minutes, because we gave him two extra minutes to address the cross appeal. Now, mind you, if you don't address the cross appeal, he doesn't get to stand back up. I would first want to say on this no economic value to Alcor, they paid Mr. Frappa 3% of sales for coming up with an ESR device. I think that's a hard pressed argument to say no economic value. What's the key thing here, your honors, to me at the end of the day, is the only thing needed to prove damages was appendix 15960. That is the list of Alcor's revenue under unjust enrichment, under the restatement. It's a burden shifting test. We put on what the sales were, it's then their burden to try to whittle down the sales. That exhibit, as the court noted on page 85 and 86 of the new trial order, also in the, when you go to, I believe it's 15714, but there's the back and forth between the attorneys and the court. I might be wrong on 1754, I've got so many appendix numbers floating around here at this point. 8586 talks about it. There was the back and forth that there were other witnesses who could bring in the document and then an alifax witness who could talk about the market and how the convoyed sales. Everything is in the record to show damages. Under 1006 versus the interplay with Federal Rule of Evidence 611A and 703, and we talk about this in, I don't know how to say the name, I believe it's U.S. v. Milkowitz, and then U.S. versus DeSimone, the First Circuit goes into, you might have used the wrong evidentiary rule for the evidence to come in, but if there was a right rule for it to come in under, as in this case, even if that included Mr. Volkart's testimony, you're fine. And that is a pretty critical thing that keeps getting left out. The other thing I would like to say is on the signal acquisition, when you look at, in the appendix, 15781, that's showing you blood mixing times. Also on 15718, pump flow rates. 15719, the pump timing. 15719, how to reduce noise. That is all material that was not public, and Duetsch talked about that that had to have come from an alifax device. So to summarize, however, at the end of the day, when we look at what happened with the unjust enrichment damages, there's no prejudice to Alcor, because everything that was needed to prove those damages were in the record, and again, under the interplay of 1006, 611A, and 703, maybe, I don't think the wrong rule was used, but maybe the wrong rule was 611A and 703, allow for what happened, and everything was. Yes, Your Honor. I remember I was asking you all to connect up the dots for me in terms of the Alcor document that you point to related to the signal acquisition trade secret, and then you said there was some testimony where there was a witness saying that document was created based off of alifax knowledge. I just want to make sure I have that citation before you have a seat. I believe that's 14010 about that. Thank you. And with that, Your Honors, again, we think that when a court is granting a new trial based on weighing of the evidence, as in the U.S. Rivera case. You are now beyond the much extra time we gave you, and just sort of rambling at this point, so we're going to call it. That's it. I thank both counsel for their argument. It was a complicated case. You both added value to our understanding of it, so thank you for that. Case is taken under submission.